**PRINTPACK, INC., Plaintiff,**

**v.**

**GRAPHIC COMMUNICATIONS UNION LOCAL 761–S, Graphic Communications International Union, and Chris Hancock, Defendants.**

**No. IP–97–0251–C–D/F.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 15, 1997.

**1202**

William H. Robbins, Rolfe Garvey Walker & Robbins, Greensburg, IN, Robert H. Buckler, Alston & Bird, Atlanta, GA, for Plaintiff.

Barbara J. Baird, Macey Macey and Swanson, Indianapolis, IN, for Defendants.

### ENTRY

DILLIN, District Judge.

This cause comes before the Court on Defendants' motion to dismiss. For the following reasons, the motion is GRANTED in part and DENIED in part.

### Background

Plaintiff Printpack, Inc. (Printpack) is a Georgia corporation that owns and operates a plant in Greensburg, Indiana. Film for packaging in the consumer market is printed and laminated at the Indiana plant. Printpack's employees are members of defendant Graphic Communications Union Local 761–S (Local 761–S), and defendant Chris Hancock (Hancock) was president of Local 761–S during the relevant time period.

Printpack purchased the Greensburg facility in August 1996 from James River Corporation. Not too long after the purchase transaction, disagreement surfaced between the new management and members of Local 761–S about the terms of the governing contract. In its Complaint, Printpack states that Chuck Ellington, vice-president of defendant Graphic Communications International Union (International Union), and Hancock, on behalf of the members of Local 761–S, sent a letter to Printpack's customers informing them of the difficulties management and the union were confronting. Among the customers who received the letter were Klosterman's Baking Company, Inc. (Klosterman's), General Mills, Inc. (General Mills) and Pillsbury Co. (Pillsbury). In the letter, Ellington and Hancock [1] stated:

> On behalf of the 460 employees of Printpack, Inc. in Greensburg, Indiana, who are members of Local 761–S, I want to alert you to a potentially alarming situation at our plant that could have an impact on the quality of the packaging materials we manufacture ....

> As you probably know, Printpack, Inc. purchased the operation last August from James River Corporation. We have always prided ourselves on working in a manner that was both productive for our customer and profitable for our management. Now, the new owners are threatening to reduce our ability to do that. We have been offered a contract that would diminish benefits and hamper working conditions for many if not all employees. When we attempted to address these issues in good faith collective bargaining, Printpack refused to budge and eventually issued an ultimatum: Either we agree to accept less that we have proven our work is worth or the Company will institute even more draconian measures next Monday, February 3.

---

1. We note that the letter is signed only by Hancock in his capacity as president of Local 761–S

and on behalf of the officers and members of Local 761–S in Greensburg.

We could understand this attitude if the plant was in financial trouble. But the quality work we produce for loyal customers such as you continues to make a profitable operation. What we are facing, I am afraid, is a new owner bent on increasing margin at the expense of employee and product. We are trying still again this week to convince Printpack, Inc. to bargain in good faith. You have our word that we seek only fair treatment. We hope that if the plant's new management provokes a strike, that you will consider withdrawing your patronage, both because we could no longer guarantee the quality of our product and because it would be the right thing to do. We will try to keep you posted on future developments.

Compl., Ex. A.

Plaintiff also states that in early February 1997, shortly after the letter was sent, agents of Local 761–S intentionally poured sand into a compressor and resin box at Printpack's Greensburg facility. During that same time, Printpack reports that agents of Local 761–S rendered the telephone lines in its Greensburg plant inoperable, leaving the company without telephone service in its bag department and warehouse for several hours.

On February 19, 1997, Printpack filed a Complaint in this Court; on July 3, 1997, plaintiff amended its Complaint. The Amended Complaint lodges three claims. First, Printpack contends that the conduct of Local 761–S and the International Union constitutes secondary activity forbidden by the National Labor Relations Act (NLRA), 29 U.S.C. § 158(b)(4)(ii)(B). In count two, Printpack alleges that all three defendants tortiously interfered with its business relations with other customers, and in count three, plaintiff asserts that Local 761–S destroyed property at the Greensburg facility thereby committing criminal mischief and violating Ind.Code § 35–43–1–2(a)(1). Based on the conduct supporting the local union's violation of § 35–43–1–2(a)(1), Printpack claims, Local 761–S is civilly liable under Ind.Code § 34–4–30–1.

On April 11, 1997, the defendants filed a motion to dismiss plaintiff's claims in their entirety. We turn now to a discussion of that motion.

*Discussion*

The defendants have moved to dismiss Printpack's three claims against them. They first seek dismissal of plaintiff's claim under the NLRA for failure to state a claim upon which relief can be granted, pursuant to Fed. R.Civ.P. 12(b)(6). Defendants seek dismissal of plaintiff's claim of tortious interference with business relations on the basis of federal preemption or, alternatively, on the merits because, defendant argues, dismissal of the federal claim renders count two meritless. Finally, defendants assert, because dismissal of plaintiff's federal claim is proper, the Court should dismiss the state law criminal mischief count for lack of jurisdiction. We begin with defendants' arguments pertaining to plaintiff's NLRA claim.

The test for dismissal under Rule 12(b)(6), is "whether it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). In addition, the factual allegations of the complaint must be taken as true and "the complaint is to be liberally construed in favor of the plaintiff." *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969); *First Interstate Bank of Nev. v. Chapman,* 837 F.2d 775, 776 (7th Cir.1988).

Plaintiff lodges its federal claim pursuant to Section 303 of the LMRA, 29 U.S.C. § 187, and seeks a remedy for alleged violations of section 8(b)(4) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(b)(4). The NLRA stipulates, in pertinent part, that:

(b) It shall be an unfair labor practice for a labor organization or its agents—

. . .

(4)(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

. . .

(B) forcing or requiring any person . . . to cease doing business with any other person . . . .

29 U.S.C. § 158(b)(4). This section of the NLRA makes it

"unlawful for a labor organization . . . to pressure a neutral [or secondary] employer where the object of the union is to force such employer to cease doing business with another employer . . . Therefore in order for a labor organization to violate this statute, it must engage in *unlawful activity* against a *neutral* employer for an *unlawful objective.*" *Sheet Metal Workers International Ass'n, Local Union No. 223 v. Atlas Sheet Metal Co. of Jacksonville,* 384 F.2d 101, 105 (5th Cir.1967).

*Brown & Root, Inc. v. Louisiana State AFL–CIO,* 10 F.3d 316, 320 (5th Cir.1994).

In order to establish a violation under § 158(b)(4), a plaintiff must satisfy two separate prongs. The first requirement focuses on the *nature* of the union's conduct: "whether the union threatened, coerced or restrained any person within the meaning of the section." *Id.* The second prong relates to the *purpose* of the union's conduct: "whether an object was to force any person to cease doing business with another." *Id.* (citation omitted). In determining whether a union's conduct reaches the statutorily prohibited level, a court must consider the union's entire course of conduct. *Brown,* 10 F.3d at 321 (citing *Wells v. N.L.R.B.,* 361 F.2d 737, 742–43 (6th Cir.1966)).

In the present case, Printpack claims that the letter defendants sent to Printpack's customers satisfies the first prong of the applicable test because the language used was threatening and coercive. Plaintiff points to defendants' warnings about a "potentially alarming situation" that "could have an impact on the quality of the packaging materials" Printpack manufactures. Printpack also focuses on the defendants' statement that the facility had a "new owner bent on increasing margin at the expense of employee and product."

Moreover, plaintiff argues, if any ambiguity existed about the meaning of the letter, such ambiguity was removed a few days after its creation when sand was poured into Printpack's main air compressor and into a resin box used to supply a film line. According to plaintiff, such acts of sabotage clearly indicated that the letter posed present threats to Printpack's customers about the quality of the company's product.

The defendants counter that the language of the letter, when read in its entirety, is not threatening or coercive. Defendants assert that the letter merely states that if the union has to strike, then its members could no longer guarantee the quality of the product because the replacement workers might not be qualified to do the job properly. Additionally, the defendants insist that the acts of sabotage were directed at Printpack, the primary employer, rather than Printpack's customers, the neutral employers. Defendants argue that a court is prohibited from considering the union's acts toward the primary employer in interpreting the union's remarks to secondary employers. Furthermore, the defendants state the acts of sabotage should not be considered because there is no allegation that Printpack's customers had any knowledge of those acts.

Mindful that on a motion to dismiss the Court must construe all facts in favor of the plaintiff, the Court is convinced that dismissal of Printpack's federal claim would be inappropriate. First, the nature of the union's conduct is drawn into question not only by the content of the letter in issue, but also by the subsequent acts of sabotage. The ambiguity in the letter becomes apparent when the reader learns that the letter issued while members of Local 761–S still were producing the Printpack product. Because union members were in control of the product, one reasonably could interpret the letter to suggest that union members themselves were in a position to compromise the quality of the product and were contemplating such act. Moreover, the Court believes that the alleged acts of sabotage and the manner in which those acts affected or may have affected Printpack's customers is a significant factor in this action. We are persuaded that further factual development of such conduct is necessary.

Having determined that Printpack has stated a claim under the first of our two-prong inquiry, we advance to the second and final factor for our consideration in the context of plaintiff's federal claim: whether defendants' object was to force Printpack's customers to cease doing business with Printpack.

Plaintiff brings to our attention that the defendants did not argue this factor in their

brief. We believe the reason for such failure is obvious. Defendant surmised that if the Court found plaintiff had pled sufficient facts regarding the *nature* of the union's conduct, then, without more, the *purpose* of that potentially threatening or coercive conduct would be called into question. If the letter ultimately is deemed threatening or coercive, certainly Printpack could prove that the purpose of the threats or coercive conduct was to force Printpack's customers to cease doing business with Printpack.

For these reasons, defendants' motion to dismiss Printpack's NLRA claim pursuant to Rule 12(b)(6) is denied. The court turns now to defendants' motion to dismiss Printpack's claim of tortious interference with business relations.

■ In their moving brief, defendants asserted that plaintiff's tortious interference claim was preempted by federal labor law. They argued that the claim was based on the same conduct as plaintiff's NLRA claim— that is, "defendants' peaceful secondary boycott activities." Because federal law completely covers secondary boycotts, defendants maintained, the NLRA preempted Printpack's tortious interference claim.

In response, plaintiff argued that exceptions to preemption exist in the field of federal labor law. Relevant to this discussion, plaintiff noted, is the exception that operates to permit states to regulate those aspects of labor relationships that involve matters of "overriding local concern." Under this exception to preemption, plaintiffs stated that labor dispute parties may pursue a variety of state claims based on tortious conduct, including conduct involving "actual or threatened violence to persons or destruction of property." Pl.'s Response at 11 (quoting *Lodge 76, Int'l Ass'n of Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 136 n. 2, 96 S.Ct. 2548, 2552 n. 2, 49 L.Ed.2d 396 (1976)). Thus, because Printpack was alleging that defendants' conduct resulted in destruction of the facility's property, Printpack fit neatly into this exception to preemption.

Defendants replied that in its complaint Printpack premised its tortious interference claim only on issuance of the letter earlier discussed. Apparently, defendants are contending that Printpack cannot now rely on the alleged acts of sabotage to support its tortious interference claim.

We remind defendants that under the liberal federal notice pleading standards, Printpack was required neither to plead facts or evidence to support its allegations nor to plead a theory of its case. *See, e.g., Homeyer v. Stanley Tulchin Assocs., Inc.,* 91 F.3d 959, 961 (7th Cir.1996). Thus, we reject defendants' contention that Printpack is foreclosed from using the alleged acts of sabotage to support its tortious interference claim.

Next, defendants, in their moving brief, argued that the Court should decline to exercise jurisdiction over Printpack's third claim—the claim in which plaintiff seeks recovery under Ind.Code § 34-4-30-1 for destruction of property. Defendants' jurisdictional argument, however, was based on dismissal of Printpack's federal labor law claim. Because the Court has determined that dismissal of Printpack's federal claim would be inappropriate, Printpack's state law claim remains viable in this Court. Defendants, themselves, recognize that further factual inquiry is required prior to disposition of this claim. Def.s' Br. at 14.

■ Finally, defendants contended in a footnote that Hancock cannot be individually liable in the context either of plaintiff's NLRA claim or plaintiff's tortious interference claim. Defendants' position on the federal claim is supported in *Park Elec. Co. v. International Bhd. of Elec. Workers,* 540 F.Supp. 779, 780 (N.D.Ill.1982). Therein, the court held that only "labor organizations" are prohibited from engaging in unfair labor practices, such as the alleged secondary activities about which Printpack presently complains. "The acts of an individual union member are not regulated by [the Act]." *Id.* (citations omitted). Hence, we dismiss Printpack's NLRA claim to the extent it charges Hancock individually.[2] Dismissal of plain-

---

**2.** We note that this argument arose from Printpack's original Complaint in which Printpack brought the federal claim against Hancock as well as Local 761–S and the International Union. However, in its Amended Complaint of July 3,

tiff's tortious interference claim against Hancock individually, however, in not appropriate. *See Mi–Jack Prods. v. International Union of Operating Eng'rs, Local 150, AFL–CIO,* 1995 WL 42066, *3 (N.D.Ill. Jan.31, 1995) (holding that plaintiff stated a tortious interference claim against individual union members because those individual defendants were alleged to have used violent means to interfere with plaintiff's relationships with its customers). Presently, plaintiff alleges that Hancock (and the other defendants) destroyed Printpack's property and thereby tortiously interfered with Printpack's relationship with its customers. We align with the *Mi–Jack* court and find that count two states a claim against Hancock individually.

In conclusion, defendants' motion to dismiss is granted in the context of plaintiff's NLRA claim to the extent it seeks dismissal of Hancock in his individual capacity. The Court notes, in fact, that, in its Amended Complaint, Printpack excluded Hancock from this claim. Defendants' motion to dismiss is denied in all other respects.

1997, Printpack excluded Hancock from its     NLRA claim.